Are Council here for our final case? Are Council here for the Sheridan case? Please move up to the table. Our final case this morning is No. 15-1858, Sheridan Transportation v. GSA. Mr. Clown. May it please the Court. So your client was providing transportation services to the government, correct? Yes, sir. And once the trailers were loaded, transported, and unloaded, did the retention of those trailers by the government constitute a breach of contract at that point? No, sir. Our understanding is that the solicitation allowed for basically four types of performance. Delivery of the trailer loads of material, detention with power units, which is with a tractor, and detention without power units, which is without a tractor. And then return of those empty trailers back to the depot or the custody of the carrier. How could it be that the government's retention of the trailers and use of them for storage would not be a breach of the contract? Well, the solicitation contemplated the material being stored on those trailers until they were utilized. Where? In the locations where they were. No, where does it say that it contemplated they're being stored? Well, it provides, Your Honor, that the trailers would be turned over to FEMA, and then once they were in FEMA's custody, they would be organically transported to the locations where they were. And then there would be a notification of the completion of the use, and the carrier would then be allowed to pick up the trailers and return them. Yeah, but where does it say that the trailers could be used by the government for storing? Your Honor, my understanding is that FEMA would determine where the trailers would be dropped. If the carrier was to provide an initial trailer movement, any movement of the trailer from the initial destination point would be transported, and the responsibility of FEMA. DLA will report daily to the carrier the location of the trailer. And then the return of empty trailers would be based upon the notification from FEMA that they had completed their use of them. Well, on page 50, for example, there's a list of things to be done, and it talks about unloading the trailer and then picking up the trailer. It doesn't say anything about storage. There's nothing in the solicitation about using the trailers for storage, is there? Well, I think Part 7J of the solicitation, Your Honor, that's Exhibit 51 on the appendix, details that the carrier will provide the return movement after the completion of the utilization of the trailers, which included storage until they were empty. In fact, in this case, there's no reference to storage, right? Well, I'm saying in this case, when the No, no, no. But in the solicitation, there's no reference to the government using the trailers for storage, correct? I think detention would contemplate storage, Your Honor. Well, there's a federal regulation that defines detention in terms of the time required for loading and unloading, correct? Well, it does, but it also expels out what you can charge, the circumstances under which you can charge when you're a driver and your equipment's delayed. Well, there is a difference, is there not, between the period of time trailer arrives at the FEMA destination, they have a reasonable time within which to unload it, whatever that may be. During that period, I suppose you could say the goods are stored in the trailer, but that's different, is it not, from the situation where the trailer gets unloaded. And, by the way, how did the trailer, do you happen to know, how did the trailer get from Louisiana to where it ended up four years later? FEMA's, under the solicitation, FEMA had the responsibility for transporting those trailers organically to wherever they needed to go, once they were turned over to them from the carrier. But if FEMA wanted to use it after they unloaded it in Louisiana and carted it off somewhere, I can't remember offhand where it ended up. Fort Worth, I believe, Texas, I believe. I'm sorry? Texas, I believe, right? Yeah. If they wanted to use it there for storage of other goods, is that, what's the arrangement for that, as you understood? I don't believe the solicitation contemplates that, and, in fact, in the incident case, that's what happened. The trailers departed their initial location with soldier's rations, and then when the carrier was notified to pick up the trailer, they sent a driver and a power unit down to pick up the trailer, and while he was picking up one of the trailers, he and a security officer looked at the trailer, and it was loaded with water. So why isn't that a breach of contract, moving the trailer from its destination to some other place and using it to store some other commodity? Well, Your Honor, if the Court please, I think it contemplates the organic movement of the trailers. Now, I'm not sure it contemplates using them to store something other than what was originally on there. Well, that's the problem, because if it doesn't contemplate that, then it sounds as though using it for that purpose is a breach. Well, I'm not sure I understand the Court's position as it relates to how the carrier would be aware of that. If FEMA or the agency has custody of your equipment and it does not notify you to pick up the equipment, and you don't know what they're doing with it except that they have it under a solicitation and a bill of lading that they're allowed to have it. Well, you knew that the trailers had arrived at their destination and were being unloaded, right? We knew that they arrived at their destination. It was our understanding that under the bill of lading, organic movements, until the material on the trailers were needed, were provided by FEMA. So why wouldn't you, knowing that it's arrived at its destination and knowing what a reasonable time for unloading would be, realize that something had gone amiss? Well, in this circumstance, Your Honor, there were differing times on the two trailers. I mean, in one instance, the trailer was dropped and there was no retransportation to another location for the carrier in one instance. In another instance, there was relocation to another area. Yeah, but it was five and a half years after the trailers arrived at their destination. Nobody would suggest that it takes five and a half years to unload a trailer, right? Well, I don't think it did, and I understand that, Your Honor. This solicitation basically had four elements of performance. You delivered the goods. You had detention with the power unit where you were unloading, like you referenced. You had detention without a power unit where you dropped the trailer full of material. And then you had a pickup of the empty trailer. And we maintained that there are three elements in these particular circumstances which we were performing services. One was the delivery, one was the detention without a power unit, and one was the pickup, which occurred from Texas, different from where the original was. How much are these trailers, the ones without power? I take it these are basically the 18-wheelers without the power. Yes, the power unit is the trailer. How much are those trailers worth? Probably $60,000. Do you think asking $10 million for the use of a $60,000 piece of equipment would probably deteriorate it over that time? I'm sure it did, and, in fact, they provided. Do you think that's a sensible thing to do? Well, there's no mechanism by which you can negotiate that. I mean, what happened was the government set and approved a rate of detention. And they determined what they would accept. The detention rate under the regulation is for the time required for loading and unloading, not for storage. Well, if you don't have a power unit and it's a trailer without a tractor, then you don't really have the ability to move it unless you, the customer, provide a tractor to transport the material on it to a dock and unload it. And in this case, it was in a location, or when it was picked up, it was in a location, loaded, and not in a position to be unloaded. Can I ask you a question? Yes, sir. Does the contract provide for a time for the government to load or unload the shipments? No, sir. It does not? No, sir. It provides two free hours of detention, though, right? They're allowed that at no charge. Where is that? E50, I think. Two free hours, but it doesn't provide an agreed time to load or unload? No, sir. But in this solicitation, there was a daily rate for the occupancy of the trailers. When you had custody of the trailers, you were billed by the day. The original concept was that the trailer was loaded with food. Right. Did the contracting parties contemplate the possibility that the government would want to reload it and unload it somewhere else? Was that ever part of the contract? I don't think that was part of the solicitation, Your Honor. I think that what was contemplated was these trailer loads of material would be staged in various localities. And then based upon the whim of the weather, they would be transported to where they were needed. And that transportation would take place either by a FEMA tractor or by a contracted FEMA tractor, not the carrier. Who initially provided the tractor? Was that you? For the delivery initially? Yes, sir. To Louisiana. Yes, sir. You all hauled it down to Louisiana and left it there. Yes, sir. We had a driver. We had a piece of equipment, and we had a trailer full of material. And we took it to Louisiana. They then told us to take it to some other place, which we did. And then we dropped the trailer, fully loaded, and returned our tractor back to our depot. They kept it. And they moved it around, apparently, because it wasn't loaded. Did you all negotiate with the government over the reasonable settlement of this at all? Basically, Your Honor, there was an offer to pay $50,000 and take it or leave it. And there was no negotiation. I'm sorry, say that again. There was an offer by the contracting agent that they would pay $50,000 for both claims, and we could take it or leave it or be paid nothing. What is the status of this addendum that you put at the back of your brief? Your Honor, that was, I believe, the addendum. There was a slight dispute because a general counsel for one of the parties, the appellees' parties, wanted to include, I'm sorry, the counsel wanted to include a general counsel letter, which was an argument. And our objection to it was. . . No, I don't mean the status as appropriately before us. I mean this is this document called SDDC Freight Traffic Rules Publication No. 1CR. Is that part of the contract? Does it govern the contract? It governs the contract. It's part of the regulations that govern the contract. Okay. You didn't file a takings claim against the government, did you? No, sir. No, okay. Okay. Okay. Do you want to stay the rest of your time, Phil? Yes, sir. Okay. Thank you, Mr. Clark. Thank you. Mr. Parada, am I pronouncing that correctly? Yes, sir. Sir, the government can't take someone's property, Mr. Parada, and cart it off and keep it for four years or five years, whatever it is, and say, by the way, come get it. You can't do that. Now, does the government think it can? Your Honor, the government has never taken the position in this case that under no circumstances would Sheridan have been entitled to some form of compensation as a result of the movement of these trailers. The issue, though, is whether Sheridan has timely asserted such a claim, and it's the government's position, as has been found by all three administrative levels below that have reviewed the issue that the claim was untimely asserted because it was asserted well more than three years after. Well, they could not have asserted it until you called up and said, oh, by the way, we're out here in Texas. We got a couple of your trailers. Come get them. How would they know otherwise where their trailer's gone? Because they're in the custody of the government. Your Honor, I don't believe that's correct, that Sheridan could not have asserted such a claim until it was notified of the return pickup location of the trailers. The only obligation Sheridan had under the terms of the contract was to deliver the trailers loaded with the soldiers' rations. Once it did so and it dropped off those trailers in Louisiana, from that moment forward it knew it had a detention claim that was accruing as of that point in time. But it was still accruing. So they could not have sued you for day 400 or day 402 or day 602 or day 702 until those days arrived. No, Your Honor. I don't believe that's correct. How could that not be true? The claim had, under general accrual principles, both under the court's case law and as defined elsewhere in the Interstate Commerce Act, of which this particular Section 3726 is also a part, accrual generally is defined as the delivery of the goods, the completion of the delivery. And in this case the trailers were delivered. Why shouldn't it be when the unloading is completed? Because, Your Honor, first of all,  that what the parties contemplated here for any detention that might have occurred was something of a brief nature. But the purpose of the detention in the unloading of the trailer is to compensate the carrier for delay in unloading, correct? Correct. Right. So if there was a delay in unloading, they're entitled to sue for that, and that claim doesn't accrue until the unloading is completed because you can't possibly know what the period of detention is until that happens. Your Honor. Particularly if you all reloaded it and hauled it off somewhere else. Right. Your Honor, what you would know clearly, though, is that the detention has occurred. No, you wouldn't know how much detention there was until the unloading was completed, would you? Your Honor, that is correct. You would not know the amount of the detention claim, but you would know that the detention claim. Take the word claim off that. You would not know the amount of the detention. I'm not aware of cases in which there is a new contractual charge for each day, and yet you have to sue before those days have even arrived. This is not about calculating a dollar value for the sequelae of an act that has already occurred. But it is, Your Honor, because the act has occurred. The detention. No, the act has not occurred. There are 800 days worth of acts that have not occurred until each day it occurs. So why can't they reach back from whenever they presented their claim in, was it the summer or in May or something of 2013, three years? Well, Your Honor, there are a couple of reasons why. First, sharing. Can I get just one thing? Yes. You are not defending the board's rationale that even had detention, compensable detention, or detention occurred after the, what is it, May 31st, 2009? Correct. That the contract wouldn't have covered that? I didn't see any defense of that rationale in your brief. That's right, Your Honor. And I think what the CBCA may have been attempting to say was that that was sort of the outside limit as to when a detention arguably might have started. It said the contract doesn't cover any activity that occurs after that date. And that's just wrong and you don't defend it. So let's get back to the main point. You have a keeping of the trailers, day one, day two, up to day 100, day 800 or something. Why is not each one of those a newly compensable act? First of all, Your Honor, at no time before any of the CBCA, GSA, or DLA, or before this court, has Sheridan Transportation ever taken the position that this is some sort of continuing claim that there's a three-year sliding window of time in which it could assert a claim and so it can reach back three years even if it can't reach back to day one. Its position has always been its claim didn't accrue. No portion of its claim ever accrued until the trailers were returned, and so that's when it could assert its claim. Right, so maybe that's too aggressive or maybe it's not too aggressive because of the provision of addendum page 12, item 90, paragraph 4, DET will end detention. DET will end when you notify the carrier that loading or unloading has been completed. You didn't do that until four years later. Why does that not establish by contract? Do you agree that this is either part of or relevant to the contract? No, I don't, Your Honor. So what is the status of this document? This document, Your Honor, is not referenced in any way in the actual contract itself, the solicitation that became the contract, and the provision that Sheridan has been relying on at addendum 13. It's not referenced. I just keep worrying about these little terms you're including in answers that are trying to avoid answering the question. Is the substance of this part of what the contractual relationship between you consists of? No. So what is this document, and why is it relevant? This document is a publication from the Service Deployment and Distribution Command. It's a publication that defines certain procedures. Does it apply the way a regulation would to contracts somehow made under its auspices, and is this such a contract? Potentially, Your Honor. This may be an agency interpretation of the underlying detention regulations that a court would afford some deference to, yes. But my point was only that this is not a document that's specifically referenced as incorporated in the contract itself. Well, one of the arguments that you sort of advert to on page 6 of your brief in footnote number 3 is a reference to a regulation, 41 CFR 102, 117, 25, that says detention is the penalty charged to an agency for delaying the agreed time to unload or unload shipments by truck. Was that regulation referenced in the contract? No, Your Honor. Okay. So you seem to be relying on some legal materials, agency-issued materials, that are not referenced in the contract, which may or may not have some bearing on the contract. So why is that regulation somehow relevant but not this agency interpretation, this addendum document? Your Honor, again, this document, we're not disputing that it may have some relevance as an agency's explanation of how detention may apply in certain circumstances. What the document makes clear and the regulation makes clear is that the purpose of detention is to compensate the carrier for delays in loading and unloading, right? Correct. It does not suggest this document, nor the solicitation itself, suggests that the purpose of the contract is to allow the government to use the trailers in some other location, to move them to another location and use them for storage, right? Correct. Is that a breach of contract to do that? Potentially it may have been, Your Honor. But again, that was a breach. But why isn't that their claim, that that was a breach, as soon as the unloading was completed and the government moved the trailer to some other location and used it for storage? Well, they certainly haven't framed it that way. But potentially, yes, Your Honor, they may have had such a claim that they could have asserted. Again, though, it brings you back to the question of timeliness of asserting such a claim. Well, figuring out what their claim is is important because unless we know what the claim is, we don't know how to apply the statute of limitations to that claim. I think you've heard from us some doubt that it can possibly be that the claim accrued upon the delivery to the destination before the unloading was completed. But why doesn't the claim accrue when a reasonable time for unloading has been completed or when the trailer is moved to some other entirely new location for storage purposes? Yes, Your Honor. Yes, what? No, I'm agreeing, Your Honor, that the claim can... You're agreeing that that's the proper way to look at the accrual issue. Yes, Your Honor, that the accrual... Again, if you look at the contract, which speaks of detention as it says that the government is entitled to up to... 10 hours of detention per day. It speaks of it in terms of hours. The actual detention rate that was agreed to in the contract is an hourly rate, not a daily rate or a monthly rate. And the underlying regulation that the court referenced moments ago defines detention as a delay that occurs in the loading or unloading of a trailer. No, no, I'm sorry. It says delayed in an agreed on, agreed time to load or unload. I'm not sure I see an agreed time. You get two hours free. The contract clearly contemplates more time because otherwise you wouldn't have the hourly rate for a number of days. So does that regulation even apply? There is no... Just tell me why this is wrong. Why is there an agreed time to unload or load? The agreed time, I think, Your Honor, you're correct. It is not a precise... The contract doesn't say you have three hours. That's a reasonable time, right? Yes, a reasonable time. And the regulation which speaks of delay in loading or unloading coupled with the contract that defines detention and the rate for that in an hourly basis seems to make clear that the parties were contemplating that should a detention occur at all, you're going to be talking about a detention of a limited duration of a few hours, maybe a day or two. Should one also couple it with this addendum document issued by the agency that says detention ends when you tell them to come pick it up? That may be when the detention ends, Your Honor, but that doesn't mean that that is when the claim for the detention accrued because, again here, Your Honor, it's important to remember that for one of these two trailers... If detention ends at that point, how can you make a claim for the detention until the detention has ended so that you know what your claim is? Your Honor, I'd like to say two things to that. One is that you certainly can because as to one of the two trailers in this case, Sharon did exactly that. It submitted a detention claim shortly after it initially dropped that trailer off for a five-day period of time that related to the diversion of that one trailer. Yeah, yeah, yeah, but they didn't make a claim for the detention that occurred after it was dropped off at the destination at that point. And, I mean, maybe you could say they should have known that a reasonable time for loading or unloading was five days, two days, whatever it is, and made a claim for that, but that seems to me rather unlikely. I don't see how you could make a claim that they'd exceeded the reasonable time for unloading until you knew how long the unloading took. Let's test that by a hypothetical. Let's assume the trailer circumstance. They bring the trailer down to Louisiana. It's got the stuff in it. And somebody down there says, Don't unload it here. Take it to Texas. And off it goes to Texas unloaded. Four years later, somebody says, What's in that trailer, by the way? Oh, there's that old stuff. Let's unload it. They unload it at that point. Has there been a detention? Yes, Your Honor, there has been a detention. There has been. And they would owe for every day of detention? The government, that is. There's been a detention that has occurred from the moment that the carrier takes the trailer to the original destination that was in the contract document, wherever it was supposed to go. From that moment, when it's dropped off at that location, the detention has occurred. Now, the carrier might not, in a scenario like this where the trailer... The contract doesn't specify the location for unloading, does it? No, Your Honor. The actual transportation order that follows from the contract for each specific shipment specifies where they're supposed to go. In that hypothetical, where the trailer arrives at its destination and the government says, No, actually, we need that trailer 20 miles away, move that trailer 20 miles away and unload it, in the period that was taken to move the trailer to this new location and to unload it would potentially be recoverable, right? Yes. In fact, it was as to one of the trailers for which Sharon submitted the detention. They've changed the destination point. Correct. But the solicitation does not provide for storage as part of the services being supplied by the carrier, right? Not specifically, no, Your Honor. It does not. I mean, it contemplates... There's language that suggests that it's possible that a trailer may be moved from the initial destination. But not for storage. No, it does not say for storage, correct. Anything else? Okay. Thank you. Thank you. Mr. Cloud? Mr. Cloud, your trailers cannot be worth $10 billion, no matter how you look at it. I would not submit this argument. Maybe I could buy a whole field of trailers for this way in August. What would be a reasonable value for what you presumably didn't have? What would be the use of a trailer for four years? Yes, sir. You mean a number? As to what that would be? These trailers generate approximately $1,000 a day, even if they're not utilized, so I mean, from a depreciation standpoint. So I think the number would be in the hundreds of thousands of dollars for four years' worth of use for two trailers. Even though the trailer's worth $30,000? Well, I think the $30,000 is somewhat presumptuous, Your Honor. I mean, we pay far more than $30,000 for new trailers. And the government assumed the responsibility for maintaining these trailers. They were going to put together a maintenance plan, which they never did. I think obviously the carrier is entitled to some compensation. Now, the only way in which we could present the claim was based upon the contract rates which we were subjected to, and that was the basis for the invoice. Well, which sort of suggests the contract didn't contemplate keeping the trailers for five and a half years. Well, I think that's true. Right. But, Judge, if you would... But if you go down that path, don't you end up by saying, the contract didn't contemplate this. This was storage. It was a breach. The breach began as soon as any outside reasonable period for unloading had come to an end. And so at that point, a claim of breach, which had just begun, had accrued, which I assume is more than three years before, what is it, May 2013 or something? Assuming the carrier had knowledge of that, Judge. Or should have known. I mean, from 2008, is that when these services took place? September of 2008? Yes. It was in the hurricane season for eight and a half years. Right. So by early 2010, you might be charged with knowledge that something outside the contemplation of this contract was going on. Well, I would submit to you, Judge, that under the solicitation, this provision for organic movements, which is on the appendix, page 49, it says that any movement of the trailer from the initial destination point will be transported in the responsibility as an organic movement performed and controlled by FEMA. So I would submit to you that the solicitation contemplated longer than just a regular load and unload. Well, in other words, they might move it to a new location. Or several locations. Right. But not that they would use it for storage. Well, I don't think storage is adequately addressed in the solicitation, Your Honor. It's contemplated that these supplies would be staged in an area, and I think implicit in that is some storage. But I can't tell you what the dimension of that storage is. It's like the SDDC freight rules, which define detention, are the organic rules that control all freight deliveries for the military. And those are incorporated in the standards under which the carrier is supposed to act. It says that detention ends when you're notified to come get your equipment. And there was no notification, nor an alleged notification. So I'm not standing here trying to justify the $10 million claim in its entirety, but to completely refuse to pay anything for the services that they received, I think is excessive. Okay. Thank you, Mr. Cloud. Thank you, Your Honor. Thank both counsel. The case is submitted. That concludes our session for this morning. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m.